# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRICKTOWN RESOURCES, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. CIV-08-928-F |
| | ) | |
| KTM SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter comes before the court on the special appearance and motion to dismiss filed by the defendant KTM Services, Inc. ("KTM") (doc. no. 7).  KTM, which removed this action from the Oklahoma County District Court on the basis of the parties' diverse citizenship, argues that the case  should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure because the court lacks personal jurisdiction over it.  KTM asserts that it had no significant contacts with the State of Oklahoma and that the plaintiff has alleged none.  In addition, KTM maintains that venue is improper under 28 U.S.C. § 1391(b).  Although the time for response has long since passed, the plaintiff, Bricktown Resources, Inc. ("Bricktown") has made no response.  The court's determination of KTM's motion is, therefore, based upon the careful consideration of KTM's submissions and the  pleadings on file.

## I.  Standards for Determining Personal Jurisdiction

There is no dispute that KTM is a Texas corporation with its principal place of business in Texas.  Oklahoma's long-arm statute permits the exercise of jurisdiction over a nonresident defendant, such as KTM, to the fullest extent permitted by the United States Constitution.  Rambo v. American Southern  Ins. Co., 839 F.2d 1415, 1416 (10th Cir. 1988).  Because the limits of Oklahoma's statutory authorization for

the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory and constitutional inquiries necessarily merge into a single due process analysis.  Intercon, Inc. v. Bell Atlantic Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000).

A defendant's rights under the Due Process Clause are protected by preventing litigation against a defendant in a distant forum where it could not reasonably expect to be haled into court.  AST  Sports Science  v. CLF Distribution Ltd., 514 F.3d 1054, 1057 (10th Cir. 2008),citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  Due process is satisfied if the nonresident defendant has "minimum contacts" with the forum state such that requiring it to defend its interest in that forum would not "offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  The sufficiency of a defendant's contacts must be evaluated by examining the defendant's conduct and connections with the forum state to assess whether the defendant has purposely availed itself of the privilege of conducting activities therein. Williams v. Bowman Livestock Equipment Co., 927 F.2d 1128, 1131 (10th Cir. 1991).

Courts recognize two types of personal jurisdiction: general and specific.  In order to establish general jurisdiction, it must be shown that the nonresident defendant has maintained continuous and systematic contact with the forum state.  *See* Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 415-416 (1984). Where general jurisdiction is found, all causes of action against a defendant, whether or not related to the defendant's activities in the state, may be pursued in that state's courts.  Less extensive contacts with the forum state will suffice to establish specific jurisdiction.  Specific jurisdiction refers to a court's exercise of jurisdiction where the lawsuit arises out of the nonresident defendant's contacts with the forum state.  A

2

finding of specific jurisdiction requires a two-step analysis. First, a court must determine whether a nonresident defendant has such minimum contacts with the forum state that he should reasonably anticipate being haled into court there. World-Wide Volkswagen Corp., 444 U.S. at 287. If minimum contacts are present, the court must then determine whether its assertion of jurisdiction would comport with the traditional notions of fair play and substantial justice. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 467 (1985). Such a determination requires a court to consider not only the burden imposed upon the out-of-state defendant, but also the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. World-Wide Volkswagen Corp. at 292.

The Due Process Clause also permits a court to exercise jurisdiction over a nonresident defendant when the defendant has expressly consented to jurisdiction in the forum state, such as when, in a commercial context, a party stipulates in advance to submit its controversy for resolution within a particular jurisdiction. Burger King Corp. at 472, n. 14. When a party has consented to jurisdiction in the forum, analysis of a party's contacts with the forum state is unnecessary. Electronic Realty Associates, L.P. v. Vaughan Real Estate, Inc., 897 F. Supp. 521 (D. Kan. 1995).

Procedurally, once the court's jurisdiction is contested, the party alleging the claims against the nonresident has the burden of showing personal jurisdiction over that party. AST Sports Science, 514 F.3d at 1056-1057 and cases cited therein. In the preliminary stages of litigation, that burden is light. Id. Where, as here, the district court considers a pre-trial motion to dismiss without conducting a preliminary hearing,

3

the party alleging jurisdiction need only make a *prima facie* showing of personal jurisdiction to defeat a motion to dismiss. *Id.* at 1057. The party may make this *prima facie* showing via affidavit or other written materials setting forth facts which, if true, would support jurisdiction over the nonresident. *Id.* When evaluating a *prima facie* case, the court is bound to resolve all factual disputes relevant to jurisdiction in favor of the party asserting jurisdiction. *Id.* The allegations of the complaint must be accepted as true to the extent they are uncontroverted by the defendant's affidavit. Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990).

## II. Factual background

This action arises from KTM's alleged breach of its contract with Bricktown. Bricktown contends that KTM refused to remit $925,000.00 of the $1,520,000.00 deposit KTM had allegedly agreed to pay toward the purchase of a $15,200,000.00 oil drilling rig. Bricktown asserts that KTM's breach deprived it of the bulk of the commission to which it was entitled as broker of the drilling rig sale.

Applying the appropriate evidentiary standards to the facts alleged in Bricktown's complaint and Tonci Tomasic's affidavit submitted on behalf of KTM, the court finds that the following pertinent facts are established for purposes of KTM's motion. All facts are derived from the affidavit of Tonci Tomasic unless otherwise attributed.

Bricktown is an Oklahoma corporation engaged in the brokerage of oilfield equipment worldwide. (Petition at ¶ 1). KTM is a Texas corporation with its principal place of business in Houston, Texas. KTM has no offices in Oklahoma and owns no property in the state. KTM maintains no agents or employees in Oklahoma. Prior to the events giving rise to this action, KTM had never done business with Bricktown.

On or about July 6, 2008, Tonci Tomasic, an owner of KTM, contacted Randy Hall of PennEnergy, an oilfield and power generation equipment resale group located in Houston, Texas. Mr. Tomasic told Mr. Hall that KTM was interested in buying two land-based oil drilling rigs and asked if Mr. Hall knew of any rigs that would meet KTM's requirements. Mr. Hall responded that he was certain that PennEnergy could assist KTM in locating the desired rigs, but noted that KTM would likely have to put money down in advance of a sale.

On July 8, 2008, Mr. Hall informed Mr. Tomasic that he had located a rig builder that could provide some of the equipment KTM needed. Mr. Hall told Mr. Tomasic to expect a call from Jim Harvey who would discuss with Mr. Tomasic a rig that Mr. Harvey's company had for sale. Within ten minutes, Mr. Harvey called Mr. Tomasic at KTM's Houston office and stated that his company had a rig for sale in Houston. He advised that KTM would be required to pay a ten percent deposit before the deal could proceed. Mr. Tomasic agreed and Mr. Harvey promptly sent an invoice for $1,520,000.00 to Mr. Tomasic at KTM's Houston office. Mr. Harvey agreed that upon Mr. Tomasic's payment of ten percent of the deposit, he would be permitted to view the rig. That same day, Mr. Tomasic wired $152,000.00 from KTM's Houston bank to Bricktown's account at MidFirst Bank in Oklahoma City. (Petition at ¶ 6).

On July 9, 2008, Mr. Tomasic and his engineer drove to PennEnergy's Houston offices and met with Mr. Hall and several Bricktown agents including Mr. Harvey. The Bricktown agents informed Mr. Tomasic that he would have to sign a "Mutual Confidentiality and Non-Circumvention Agreement" (the "Agreement") in order to examine the rig. Believing that Bricktown was a rig builder, Mr. Tomasic signed the Agreement on behalf of KTM. Following the meeting, the group traveled to BHL International ("BHL") in Houston and met with Rauel Lataquin. Over the course of

5

this meeting, Mr. Tomasic concluded that Bricktown was not actually a rig builder and that it did not represent BHL.  Mr. Tomasic later learned that BHL was actually the rig builder.  A second meeting was held the following day at PennEnergy's Houston office.  Paul Westervelt, the Chief Operating Officer of PennEnergy, attended this meeting.  He and the Bricktown agents pressed KTM to come up with a scheduled payment for securing the drilling rig.  For the first time, Bricktown's agents admitted that Bricktown was a broker and not a rig builder. They claimed to be working with BHL to secure for KTM the best possible price on the rig.

The next week, Mr. Tomasic spoke directly with Rauel Lataquin of BHL who stated that Bricktown did not represent BHL.  Mr. Lataquin also informed Mr. Tomasic that BHL had received none of KTM's $152,000.00 deposit. Mr. Lataquin made it clear that BHL had not signed any agreement with Bricktown in connection with the sale of the rig.  Shortly thereafter, Bricktown, asserting the terms of the Agreement, demanded that KTM pay Bricktown a five percent commission for the sale of the rig.  KTM refused and Bricktown filed suit in Oklahoma state court.  KTM timely removed the action to the Western District of Oklahoma reserving the issue of jurisdiction in its Notice of Removal.  KTM maintains that it never agreed, contractually or otherwise, to submit itself to the jurisdiction of an Oklahoma court.

### III.  Analysis

KTM alleges that the court lacks personal jurisdiction because KTM never consented to jurisdiction in Oklahoma and because Bricktown has failed to demonstrate that KTM has had any significant Oklahoma contacts relevant to the claim asserted in this case.

Bricktown has offered nothing to show that KTM maintained the sort of continuous and systematic contact with Oklahoma that would support a finding of

general jurisdiction.  Bricktown's brief petition sets forth only two factual allegations that in any way connect KTM with Oklahoma.  First, Bricktown alleges that KTM entered into a contract with Bricktown, an Oklahoma corporation, to purchase a drilling rig from Bricktown for the total sum of $15,200,000.00.  Second, Bricktown alleges that KTM, in partial performance of that contract, wired the sum of $152,000.00 to Bricktown's account in an Oklahoma bank.  The issue before the court is whether those two contacts are sufficient to vest this court with specific personal jurisdiction over a Texas corporation with no further relevant contacts in this state.

Whether a nonresident's activities in the forum state are sufficient to confer personal jurisdiction depends on the totality of facts.  The totality of the facts in this case reveal that almost all of the activities relating to KTM's attempt to purchase the drilling rig at issue occurred in Texas.  KTM sought out a Texas company to supply the rig. The rig eventually offered was located in Texas.  It was owned by a company with offices in Texas.  KTM did not solicit the services of Bricktown.  Rather, Bricktown unilaterally contacted KTM in Texas to inform it of the rig's availability. Bricktown's agents traveled to Texas to discuss the rig's sale and to negotiate a contract which was to be performed there.  The contract was signed in Texas and it appears that Texas law will apply to the parties' contract dispute.  The only contact KTM initiated with Oklahoma was its wiring of funds to Midfirst Bank at Bricktown's behest.

Standing alone, the fact that KTM contracted with Bricktown is not enough to permit an Oklahoma Court to exercise jurisdiction over KTM.  *See* Pro Axess, Inc. v. Orlux Distribution, Inc., 428 F.3d 1270, 1277 (10th Cir. 2005); Burger King Corp., 471 U.S. at 478 ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other

party's home forum ...   The answer clearly is that it cannot.")(emphasis in the original).  However, "with respect to interstate contractual obligations, ... parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities."  <u>Burger King Corp.</u> at 473 (quotations omitted).

Bricktown has offered nothing to suggest that KTM "reached out beyond" the state of Texas and entered into a continuing relationship with Bricktown.  Almost every detail of the parties' negotiations and business interactions with regard to KTM's potential purchase of the oil drilling rig occurred in Texas.  The court is unable to conclude that KTM, by wiring funds to an Oklahoma account and entering into a single contract with an Oklahoma corporation, engaged in such contact with the state of Oklahoma as to have purposely availed itself of the privilege of conducting business activities within the state.  *See* <u>Soma Medical International v. Standard Chartered Bank</u>, 196 F.3d 1292, 1298-1299 (10th Cir. 1999) (A British bank's few mailed communications and wire transfers of funds to the plaintiff in Utah did not amount to minimum contacts with the state of Utah where the bank did not solicit the plaintiff's business); *see also* <u>Premier Corporation v. Chavez</u>, 620 F.2d 219 (10th Cir. 1980).

Because Bricktown has failed to make a *prima facie* showing that  that KTM purposely availed itself of the benefits of Oklahoma law, the court concludes that KTM could not have reasonably anticipated being haled into court here.  To exercise personal jurisdiction over KTM under such circumstances would offend traditional notions of  fair play and substantial justice in violation of the Due Process Clause and Oklahoma's long-arm statute.  Bricktown's claims against KTM, should therefore, be dismissed.

IV.  Conclusion

For the reasons set forth above, the court **GRANTS** the defendant KTM Services, Inc.'s motion to dismiss for lack of personal jurisdiction and **DISMISSES** this action without prejudice.  KTM's alternative motion for a change of venue is **STRICKEN** as moot.

IT IS SO ORDERED this 23rd day of October, 2008.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


08-0928p002 (pub).wpd

9